IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 19, 2022, at Jackson

## STATE OF TENNESSEE v. JAMES R. TRENT, III

**Appeal from the Criminal Court for Knox County**
**No. 117348    Kyle A. Hixson, Judge**

_____

### No. E2021-01317-CCA-R3-CD

_____

A Knox County jury convicted the Defendant, James R. Trent, III, of two counts of aggravated assault in concert with two or more people and one count of aggravated assault as a lesser-included offense of attempted especially aggravated robbery. The trial court merged the offenses into a single aggravated assault conviction and sentenced him to an effective sentence of twelve years in the Tennessee Department of Correction. On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., joined. JOHN EVERETT WILLIAMS, P.J., not participating. [1]

Joseph Liddell Kirk (on appeal) and Michael Anthony Graves and William J. Taylor (at trial), Knoxville, Tennessee, for the appellant, James R. Trent, III.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley McDermott and Greg Eisenberg, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from a shooting on January 17, 2019, in Knox County, Tennessee. For this shooting, a Knox County grand jury indicted the Defendant for aggravated assault,

_____

[1] The Honorable John Everett Williams died September 2, 2022, and did not participate in this opinion. We acknowledge his faithful service to this Court.

attempted especially aggravated assault, attempted second degree murder, and employing a firearm during a dangerous felony.[2]

## A. Trial

At the Defendant's trial, the parties presented the following evidence: Alan Keith testified that he lived on Chillicothe Street at the time of this shooting and that he called 911. Leading up to his 911 call, he said he was standing at his sink washing dishes and saw the victim, Austin Andrew Dakota Wyatt, walking up and down the street. The victim often walked in this area and never caused any trouble or bothered anyone. When Mr. Keith looked back, he noted that the victim was surrounded by a group of four men, whom he estimated to be between sixteen and twenty-one years old. He heard what sounded like a firecracker, so he ran outside and asked "what's going on?"

The men fled, and the victim stood up and had blood running down his leg. He said, "I [have] been shot. Call 911." Mr. Keith complied and stayed with the victim until emergency responders arrived. While waiting on responders, the victim told Mr. Keith that all four men were African-American and that he had seen them before because they lived nearby. Mr. Wyatt described the gun as silver with a black handle.

The victim, who described himself as having autism, recounted the events surrounding the shooting. He was twenty at the time, having graduated from high school two years before with a special education diploma. The victim was living with his mother and younger sister and was not employed. During the day he played video games at home and went on walks around the neighborhood. His mother gave him money to purchase food or a drink, which he kept in his pocket on his walks.

Before the shooting, the victim decided to purchase a liter of Mountain Dew from the Dollar Tree that was within walking distance. He wore headphones during the walk, which he took out if he passed anyone, and he said he spent a lot of time looking down while walking. Before getting to the Dollar Tree, and while he was near Hardee's, he was approached by four men. He believed that these were men that "h[u]ng out" in a white house that was near his house. He noted that, if he was walking by the white house, he would wave at the men. One of the men was familiar to the victim because he went to high school with him. He was usually with two of the other men.

---

[2] The grand jury indicted the Defendant with a criminal gang enhancement. After a bifurcated proceeding, the jury found that, while the Defendant was a gang member, the crimes were not committed for the benefit of his gang, making the criminal gang enhancements inapplicable. As such, we will omit evidence pertaining to the gang enhancement issue.

When the victim noticed the men, they were within ten to fifteen feet of him by the time he noticed them, as he had headphones on and was looking down. They said "a couple of things" to him in "kind of like . . . a playful manner." The victim stopped because "normally I would . . . stop and talk to somebody if they're talking." Then he noticed one of the men, an African-American, produce a gun from the pocket of his black hoodie. The gun was silver with a black handle. The men appeared to "play it off for a second," but one of them made a joke about fighting and told the victim to walk with them. One of the men, who was Hispanic or biracial and was wearing a dark red, or maroon colored t-shirt, said, "Hey man, you want to fight, bro?" The victim still believed that they were joking around.

One of the men who was not armed said, "Hey, you know, give me your wallet." The victim said he thought the man was joking, but he responded that he did not carry a wallet. The men laughed like it was a joke and said that they were just kidding. The victim felt confused and as if something was not right. He then looked down and noticed that he had been shot, so he fell. He unsuccessfully tried to stand up and walk, so he leaned on a fence. Mr. Keith then arrived.

The victim described his injury, saying that the bullet entered his leg, exited his leg and then entered his groin and exited his groin. The pain became intense once he was in the ambulance. He said it was the worst pain he had ever experienced. The victim did not recall anything after the ambulance until he woke up from surgery. He stayed in the hospital for four or five days before being discharged. He still suffered from swelling in his right leg because of insufficient blood flow.

The victim said that the coins he had with him were not taken. His cell phone and headphones, however, were missing when he got into the ambulance.

During cross-examination, the victim agreed that one of the men made a comment about the gun being fake during the incident. He was unsure whether the men intentionally shot him.

The victim's mother, Barbara Mershon, testified and described the victim as having Asperger's, an autism spectrum disorder, which meant it was difficult for him to understand social interactions. He participated in multiple therapy programs, but continued to keep to himself. She did not force him into crowded places, as it seemed to cause him to have sensory overload. Ms. Mershon testified that she never had problems with the victim being violent, either at home or in school.

3

Around the time of this shooting, the victim's routine included walking in the neighborhood. He would often go to the nearby Dollar Tree, Hardees, or Weigels stores to get a drink or candy or French fries.

Ms. Mershon described the victim's injury and subsequent surgeries, saying that he had multiple surgeries lasting over six hours. The shot went through his leg, then into his groin, and through his scrotum. The victim had severe pain and swelling. The bullet completely bisected one of the victim's femoral veins, which was irreparable, so he only had one remaining femoral vein. This left him with continued swelling.

Logan Haun testified that he was at the home of Yusuf Davis, who was his eighteen-year-old friend, on the night of this shooting. Mr. Davis lived in the white house described by the victim. There were four other people present that evening, James (known as Goldrush or Ricky) Trent, Daeqwon Wilkerson (known to him as "Qwon"), Haider Mohammad, and Jaquarius Ballenger. He identified Mr. Trent as the Defendant and described him as a Caucasian, thin male with blond hair. Mr. Ballenger he described as dark-skinned African-American, tall and skinny. He said he had dreads at the time. Mr. Haun and Mr. Ballenger had gone to school together since sixth grade. Mr. Wilkerson he described as African-American and said he was "a little bit beefier" than the rest. Mr. Mohammad looked Middle Eastern or Egyptian, but he was unsure. He recalled that "a couple of them" were wearing black hoodies and black pants.

Those four men asked him for a ride to the tobacco store in the late morning, early afternoon, and Mr. Haun told them "no." Earlier, the Defendant produced a gun and showed it to everyone else, allowing them to touch and hold it. The men told Mr. Haun and Mr. Davis that they were going to the Weigel's store. The men were gone for approximately twenty or thirty minutes and returned screaming. They were "freaking out" and seemed skittish and panicked. The men were "pointing fingers at each other saying who did what." He ascertained that they had shot the victim, whom Mr. Haun knew from the neighborhood.

Upon learning that the men had shot the victim, Mr. Haun became distressed. He immediately left and went home and told his mother what had happened. His mother contacted the victim's mother who then got in touch with Investigator Terry. Investigator Terry contacted Mr. Haun to discuss the shooting. Mr. Haun told the investigator that the four men were involved in the shooting.

Mr. Yusef Davis testified that he lived with his father, stepmother, and siblings in the white house identified by the victim. Mr. Davis confirmed Mr. Haun's recount of the events of the evening of the shooting. He added that, when the men returned, Mr. Wilkerson was angry with the Defendant. Mr. Ballenger seemed confused or shocked.

4

The Defendant said that he had shot someone and Mr. Davis ascertained from the conversation that the Defendant had shot the victim.

The Defendant also showed Mr. Davis the gun he used in the shooting, which looked like a silver 9mm, and asked if Mr. Davis could hide the gun. Mr. Davis declined but, shortly thereafter, found the gun inside the tank of his toilet. He immediately took the gun outside and told the Defendant to take the gun away.

Mr. Davis said that he was extremely angry with the Defendant for coming to his neighborhood and shooting the victim. He knew that the victim had special needs, and he said that the victim never bothered anyone.

During cross-examination, Mr. Davis said that he did not observe the shooting and only heard what the four men said about it.

Police Officer Keith Lyon, with the Knoxville Police Department, responded to this shooting where he found the victim suffering from a gunshot wound. He noted that his pants were becoming "pretty bloody" and that he was losing the ability to speak because he was becoming intermittently unconscious.

Crime scene analyst Rachel Warren arrived at this crime scene at around 1:20 p.m. There, she saw the pants that had been cut from the victim and one of his shoes. There was a cell phone case attached to the belt in the pants, but she did not find a matching cell phone or any head phones. Ms. Warren also saw a shell casing located some distance away, and there was blood on the ground between the location of the clothing and the location of the shell casing. Ms. Warren retrieved the victim's belongings from the hospital, and it did not contain a cell phone or headphones. Back at her office, she examined the pants and found $5.55 in change in the pants' pocket. She also examined the shell casing, which she determined was from a 9mm handgun.

Investigator Chas Terry, with the Knoxville Police Department, recounted his investigation in this case. He said he responded to the call from patrol about a shooting, and discovered a large pool of blood, one shell casing, and the victim's clothing that had been removed by emergency responders. He spoke with people in the neighborhood and, based upon this, he contacted Mr. Haun and Mr. Davis. In a photographic lineup, both men identified the Defendant as being the man who said that he shot the victim.

Based upon Mr. Haun's statements, Investigator Terry pulled the pictures of Mr. Wilkerson, the Defendant, Mr. Ballenger, and Mr. Mohammad. He spoke with Mr. Ballenger and his parents, and attempted to communicate with Mr. Wilkerson, who was in DCS custody and living in transitional housing. He spoke with the Defendant when the

5

Defendant came to the police department. After being given Miranda warnings, the Defendant signed a waiver of his rights and provided the investigator with consent to search his cell phone.

The State played a video of Investigator Terry's interview with the Defendant. During the interview, the Defendant said that he went to the store with the three other men to get something to eat and drink. On the way, they saw the victim, and Mr. Wilkerson was "playing" with the victim and waving the gun and acting like they were going to go fight. They squared up, and then the victim kicked Mr. Wilkerson, so the Defendant shot at him to scare him. He "popped" him in his leg. The Defendant said that, after he shot the victim, he ran back to Mr. Davis's house and hid the gun in Mr. Davis's toilet. He agreed that Mr. Davis brought the gun to him and told him that he could not leave it at his house. The Defendant then left with one of his brother's friends, Adonis, and "just rode around." He did not recall what he did with the gun. Investigator Terry wanted to find the gun's location but was unsuccessful.

During further examination, Investigator Terry testified that, based upon statements from Mr. Mohammad and Mr. Davis, he believed that the Defendant was the shooter in this case.

Based upon this evidence, the jury convicted the Defendant of two counts of aggravated assault in concert with two or more people and one count of aggravated assault as a lesser-included offense of attempted especially aggravated robbery. The trial court merged the offenses into a single aggravated assault conviction and sentenced the Defendant to twelve years of incarceration. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant argues that the evidence was insufficient to support his convictions. He contends that the State did not present sufficient evidence that he shot the victim while in concert with two or more people. The State counters that the evidence, viewed in the light most favorable to the State, supports the jury's verdict. We agree.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial

evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

7

The Defendant was convicted of two counts of aggravated assault while in concert with two or more people and one count of aggravated assault as a lesser included offense. Pursuant to Tennessee Code Annotated section 39-13-102, a person commits aggravated assault by intentionally, knowingly, or recklessly committing an assault that results in serious bodily injury to another or by intentionally or knowingly committing an assault through the use or display of a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(i), (iii) (2018). Aggravated assault as charged herein is a Class C felony. T.C.A. § 39-13-102(e)(i)(A). Tennessee Code Annotated section 39-12-302 provides that "[a] crime of force or violence committed while acting in concert with two or more other persons shall be classified one classification higher than if it was committed alone."

We first turn to address whether the evidence sufficiently supports the Defendant's conviction for aggravated assault. The Defendant notes that the victim's testimony described the person who had the hand-gun as a dark-skinned African-American, which differed from him as a blonde, white male. The Defendant notes that the victim never described a white male as being present during the altercation at all. The Defendant acknowledges that there was other testimony that he was with the group and possessed the handgun. As the Defendant acknowledges, all conflicts in testimony are resolved by the trier of fact. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

The evidence, viewed in the light most favorable to the State, proved that the Defendant brought a handgun to Mr. Davis's house, where he showed it to the other men and allowed them to hold it. The Defendant then went with three other men to get something to eat. Upon returning, he told Mr. Davis that he had shot someone and asked to hide the gun. Mr. Davis refused, but then found the handgun hidden in the back of his toilet. He brought the gun to the Defendant and told him to take it away. The Defendant spoke with police and admitted that he "popped" someone, that he attempted to hide the gun, and that he took the gun with him. The evidence clearly supports the verdict.

The Defendant further contends that the evidence does not support the jury's finding that he acted in concert with two or more people in committing this offense. The Defendant acts "in concert" with another if the defendant acts:

"with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." [T.C.A. § 39-11-402(2)]. This Court has previously held, "[a]ll who are present at the commission of a robbery, rendering it countenance and encouragement, ready to assist should the necessity arrive, are liable as principal actors." *Maxwell v. State*, 441 S.W.2d 503, 504 (Tenn. Crim. App. 1969). Thus, "[t]o

8

be criminally responsible, the accused need not have . . . actually participated in any other act of force or violence; it is sufficient if he was present, aiding and abetting, or ready and willing to aid if necessary." *Id.*

*State v. Lenardo DeQayne Spencer, et. al,* No. M2016-01219-CCA-R3-CD, 2017 WL 2800147, at *X (Tenn. Crim. App., at Nashville, Mar. 21, 2017), *perm. app. denied* (Tenn. Nov. 16, 2017)

In this case, the evidence shows that all the men were aware that the Defendant possessed a weapon before leaving the house to go together to get something to eat. They all approached the victim. One man asked the victim for his wallet, and he refused. Another man asked the victim if he wanted to fight. The victim, suffering from a spectrum disorder, was uncertain if the men were joking or serious. When the victim responded that he did not have a wallet, the Defendant shot the victim in the leg. The men took the victim's cell phone before they fled together. Then men returned to Mr. Davis's house and regrouped about their next steps. This evidence supports the jury's finding that the Defendant acted in concert with two more people when committing this aggravated assault.

### III. Conclusion

Based upon the foregoing, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

9